# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

MARLENE K. MILLS,

      Plaintiff,

v.                                   Case No. 07-CV-14648

MASON CONSOLIDATED SCHOOL
DISTRICT, DONALD PEARCE AND
BRIAN THOMPSON,

      Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO STRIKE

Pending before the court is a motion for summary judgment, filed on July 25, 2008 by Defendants Mason Consolidated School District ("MCSD" or "Board"), Donald Pearce, and Brian Thompson. Following a hearing on the matter and for the reasons stated below, the court will grant Defendants' motion for summary judgment.

## I. BACKGROUND

Plaintiff Marlene K. Mills filed a complaint against Defendant MCSD, Defendant Pearce, and Defendant Thompson for alleged sexual harassment and sex discrimination performed while Plaintiff served as superintendent of MCSD. Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and violations under the corresponding Michigan statute, the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. L. §§ 37.2101 *et seq.* Plaintiff also alleges breach of

contract based on constructive discharge, retaliation claims under both Title VII, 42 U.S.C. § 2000e-3(a), and ELCRA, Mich. Comp. L. § 37.2701(a), violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and violation of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983.  Defendants deny the allegations of sexual harassment or sexual discrimination made by the Plaintiff.

Plaintiff served as superintendent of MCSD from April 15, 2002 until her resignation on December 2006, effective January 31, 2007.  (Def.'s Mot. at 1, 6.)  The Board last renewed Plaintiff's contract July 1, 2005 to extend it through June 30, 2010.  (Pl.'s Compl. ¶ 23.)  During Plaintiff's tenure at MCSD, Plaintiff made improvements throughout the district, leading to the middle school's listing in the top twenty-five for the National School Change Award (Pl.'s Dep. at 90), Plaintiff received consistently positive performance reviews from the Board (Def.'s Mot. at 1), in addition to receiving discretionary bonuses from the Board (Def.'s Mot. at 1).  However, like many school districts in Michigan, MCSD was not without difficulties.  As superintendent, Plaintiff made decisions to layoff staff including teachers, secretaries, custodians, and bus drivers (Def.'s Mot. at 5), suspend teachers (Def.'s Mot. at 13), and argue for increased responsibilities for administrative staff due to budgetary concerns (Def.'s Mot. at 9-12).

Beginning in the spring of 2006, Plaintiff recounts a number of occasions upon which she alleges Defendants sexually harassed her or verbally attacked or demeaned her on the basis of her sex.  The first occasion occurred in the spring of 2006 when Plaintiff alleges that Defendant Thompson "ambushed," embarrassed, and humiliated her following a public Board meeting.  (Pl.'s Dep. at 44-45.)  After accusing Plaintiff of having his house watched, Defendant Thompson said, "I'm a 38-year-old man.  I'll come

2

home at whatever time of the day or night I want.  You can come pe[e]k in my windows."
(Pl.'s Dep. at 45.)  Defendant Thompson maintains that he spoke publicly in order to
rebut rumors that he did not live in the school district as Board rules require.  (Pl.'s Dep.
at 45.)

Plaintiff further complains of a pattern of Defendant Pearce usurping her duties,
undermining her authority, and failing to communicate with her while Defendant was
President of the Board.  (Pl.'s Resp. at 13.)  Plaintiff alleges that Defendant Pearce's
actions include: accepting the resignation of technology director, Ted Kidd, in
September 2006 without communicating this to Plaintiff (Pl.'s Resp. at 14; Pl.'s Dep. at
110); allowing Principal Tom McGarry to discontinue serving as principal at two MCSD
schools and appointing Joanne Spicer to serve as high school principal in the fall of
2005 in contravention of Plaintiff's recommendation and the Board's decision, (Pl.'s
Resp. at 14; Pl.'s Dep. at 122); telling teachers aggrieved by Plaintiff's disciplinary
decisions to address him to settle any issues (Pl.'s Resp. at 15); inserting himself into
union negotiations so as to constructively exclude Plaintiff (Pl.'s Resp. at 16); taking
over a fraud investigation involving a staff member (Pl.'s Resp. at 16); directing that any
FOIA requests be sent to him (Pl.'s Resp. at 16); excluding Plaintiff from plans for a
district vocational nurse-training program that Plaintiff initiated (Pl.'s Resp. at 16-17);
regularly screening and failing to return Plaintiff's calls and emails such that doing so
interfered with Plaintiff's ability to perform her own duties (Pl.'s Resp. at 4); failing to
communicate with Plaintiff because of her sex (Pl.'s Resp. at 4); in particular, Plaintiff
stated in her deposition that Defendant Pearce:

said to me several times and in front of other people too that he doesn't talk to me because he was uncomfortable talking with me because I'm a woman. He didn't look at me, he wouldn't look at me in the eye. He set up meetings and [would] not show up. He wouldn't return phone calls whether they were during the day. . . . [H]e took over many of my responsibilities and wouldn't talk to me which made it difficult. He told the staff to call him, he wanted to know what was going on, and that happened. . . . There are so many different incidents. It was just pervasive. It went on all the time.

(Pl.'s Dep. at 63-64); and failing to reprimand Defendant Thompson for his comments to Plaintiff about peeking in his windows (Pl.'s Resp. at 4-5).

Plaintiff's final complaint results from the occasion of her informal quarterly review with the Board in October 2006. (Pl.'s Dep. at 87.) With no prearranged format as Plaintiff and Defendant Pearce would customarily agree to, Defendant Pearce informed Plaintiff at the meeting that each Board member would have twenty minutes to say whatever the member liked to Plaintiff about her performance as superintendent and Plaintiff could not respond while Board members spoke. (Pl.'s Dep. at 90-92.) At the review, Plaintiff maintains the first three Board members made positive comments, but the remaining four Board members had only angrily negative things to say to her. (Pl.'s Dep. at 91-92.) During this meeting, Plaintiff also complains that Defendant Thompson told her, "I have to have the balls to tell you you are doing a lousy job." (Pl.'s Dep. at 87.)

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-

moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the accuracy, but rather to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). They must put forth enough evidence to show that there exists a genuine issue to be decided at trial. *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256). "In order to survive summary judgment, Plaintiff cannot rely on conjecture or conclusory accusations," *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008), but summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury," *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material.

*See id.* at 252 (emphasis and alteration in original) (citation omitted) ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

## III. DISCUSSION

Plaintiff argues that the court should deny Defendants' motion for summary judgment because material questions of fact exist regarding whether Defendants sexually harassed Plaintiff through Defendant Thompson's remarks following the spring Board meeting and during the October 2006 meeting, and through Defendant Pearce's lack of communication with Plaintiff because he was "uncomfortable" speaking to Plaintiff because she is a woman such that Defendant Pearce's actions and the format of the October 2006 meeting precluded Plaintiff from effectively performing her job.

### A. Title VII and Elliott-Larsen Hostile Environment Claims

Title VII of the Civil Rights Act of 1964 states:

It shall be an unlawful employment practice for an employer - - (1) to fail of refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

A plaintiff may "establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."[1] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). However, "not all workplace conduct that may be described as 'harassment'" is actionable. *Id.* at 67. To establish a prima facie case for hostile environment sexual harassment under Title VII, a plaintiff must show: (1) the employee is a member of a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based on the employee's sex; (4) the harassment created a hostile or offensive work environment that was severe or pervasive; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462-63 (6th Cir.

---

[1] Under Title VII, if a plaintiff cannot show that harassment was "severe or pervasive," the plaintiff may nonetheless make a claim of quid pro quo harassment. *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000) ("To prevail under a sexual harassment claim without showing that the harassment was severe or pervasive, the employee must prove the following: 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of *respondeat superior* liability."). However, Plaintiff has made no such claim in this case. She bases her claims on the "severe or pervasive" nature of a hostile work environment.

2000); *see also Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-830 (6th Cir. 1999) (following

the Sixth Circuit's decision in *Blakenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872

(6th Cir. 1997)).

Plaintiff's complaint details a number of incidents she alleges constitute sexual

harassment under Title VII:

> a) "Defendants willfully and intentionally interfered with Plaintiff's
> contract with the intention of frustrating her in her performance and
> effectiveness, and obtained their ultimate goal of forcing her out of
> her position as Superintendent."  (Pl.'s Compl. ¶ 25.)
>
> b) Defendant Pearce told Plaintiff he could not talk with women
> because it made him uncomfortable.  (Pl.'s Dep. at 63-64.)
>
> c) Defendant Pearce repeatedly and frequently failed to return
> Plaintiff's phone calls and emails, would not show up for scheduled
> meetings with Plaintiff, and stated that his lack of communication
> was because of Plaintiff's sex.  (Pl.'s Resp. at 4.)
>
> d) Following a Board meeting one night and in public, Defendant
> Thompson accused Plaintiff of spying on his house and invited her
> to peek in his windows.  (Pl.'s Resp. at 4.)
>
> e) At a Board review of Plaintiff's performance, Defendant
> Thompson said he was the only one with "the balls" to tell Plaintiff
> how poorly she was doing her job.  (Pl.'s Resp. at 1.)
>
> f) Defendant Pearce instituted a new procedure at a closed,
> informal quarterly review of Plaintiff's performance during which
> Board members were allowed to verbally criticize Plaintiff for twenty
> minutes each and Plaintiff was not allowed to respond.  (Pl.'s Dep.
> at 90-92.)

To maintain a claim under Title VII for sexual harassment, Plaintiff must allege

and show harassment that is "based upon sex."  *Fenton*, 174 F.3d at 830.  Generally,

such claims allege conduct, or at least communications, explicitly sexual in nature.

However, behavior or language that is not explicitly sexual in nature may nonetheless

satisfy the "based on sex" requirement if "it evinces anti-female animus." *Williams*, 187

F.3d at 565 ("[T]he conduct underlying a sexual harassment claim need not be overtly

sexual in nature. *Any* unequal treatment of an employee *that would not occur but for*

*the employee's gender* may, if sufficiently severe or pervasive under the *Harris*

standard, constitute a hostile environment in violation of Title VII.") (emphasis in the

original). "Animus," in turn, is "a usually prejudiced and often spiteful or malevolent ill

will." Merriam-Webster, *available at* http://www.merriam-webster.com/dictionary

/animus (last visited Sept. 18, 2008). It is an "actuating feeling, disposition in a

particular direction, animating spirit or temper, usually of a hostile character; hence,

animosity." Oxford English Dictionary Online, (2d ed. 1989). *See, e.g.*, *Hall v. Gus*

*Constr. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988) (stating that anti-female animus

involves "[i]ntimidation and hostility toward women because they are women"); *Hicks v.*

*Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987) (deciding that evidence of anti-

female animus includes "threats of physical violence and incidents of verbal abuse");

*Baugham v. Battered Women, Inc.*, 211 Fed. Appx. 432, 439 (6th Cir. 2006) (finding that

plaintiff did not show that defendant "harbored hostility toward females" sufficient to

overcome summary judgment); *Hensman v. City of Riverview*, No. 06-CV-14756-DT,

2008 WL 821940, at *8 (E.D. Mich. Mar. 26, 2008) (quoting *Harris v. Forklift Systems,*

*Inc.*, 510 U.S. 17, 21 (1993) (stating that "discriminatory intimidation, ridicule, and insult"

are the types of behavior that evince an anti-female animus)).

Plaintiff has not demonstrated that any of the alleged harassment occurred

"because of sex" or that such harassment was "based on sex." Defendant Thompson's

alleged taunt that Plaintiff could "peek" in his windows (Pl.'s Dep. at 45) and his

9

statement that he had "the balls" to tell Plaintiff – and more accurately, as the meeting's audio tape reveals, "to tell *someone*" – that "a lousy job" was being done (Pl.'s Dep. at 87; Def's Ex. 41) do appear aggressively ill-tempered and, as to the latter, a vulgar but unfortunately common figure of speech. However, neither is objectively explicitly sexual in nature.[2] In the context described by Plaintiff, neither of these evinces anti-female animus, nor is either in any relevant way "based on sex." Within the facts of this case, these statements are not within the purview of Title VII.

The bulk of Plaintiff's allegations, however, focus upon Defendant Pearce and revolve around, first, his supposed statement that he felt "uncomfortable" speaking to Plaintiff as a woman and, second, the ensuing undermining of Plaintiff's authority and usurpation of her duties. Yet Plaintiff fails to explain, and the court fails to see, how this behavior demonstrates "anti-female animus." Granting, as the court must in examining a motion for summary judgment, the assumption that Defendant Pearce actually made these comments and engaged in this behavior, they simply do not rise to the level of

---

[2] On two successive occasions in oral argument Plaintiff's counsel argued that Plaintiff "interpret[ed]" each of these statements "as having sexual connotations." (Summ. J. Hr'g Tr. 22, Sept. 17, 2008.) When challenged to identify just where in her deposition Plaintiff had said any such thing, counsel withdrew her argument, saying (as to the "balls" comment) that Plaintiff's "deposition might be somewhat incomplete in that respect," and (as to the "peek in the windows" statement) that "I don't believe she says that directly." (Hr'g Tr. 19, 22.) Indeed, on an independent review of Plaintiff's deposition, the court can find no sexual connotation being suggested or even hinted at. Plaintiff said she was "humiliated" principally upon being "ambushed" (Pl.'s Dep. at 44-45) at a *public* meeting. Further, the court observes with some concern that Plaintiff had refused to specify anything in this regard in her answers to interrogatories, claiming that the task would be "too burdensome" and that Defendant should either refer to Plaintiff's complaint or wait for Plaintiff's deposition for the details (Pl. Ans. Interrog. #14). There was, however, no specificity in this regard to be found in Plaintiff's complaint, and, as is now made clear, none revealed in her deposition.

animus toward women as women.  Defendant Pearce's comments do not show "[i]ntimidation," "hostility," "threats," "abuse," or "ridicule[] and insult" of Plaintiff because she is a woman.  *See*, *Hall*, 842 F.2d at 1014; *Hicks*, 833 F.2d at 1415; *Hensman*, 2008 WL 821940, at *8.  There is no indication of spitefulness, malevolence, or animosity in these remarks.  On the surface, they show Defendant Pearce as expressing a lack of comfort and an accordingly difficult time speaking to or interacting with women.  Below the surface, but at best, Plaintiff has pointed to evidence that Pearce's discomfort has manifested itself in strained relationships with a few women in addition to Plaintiff.  Title VII, however, "requires neither asexuality nor androgyny in the workplace," *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000), and "does not prohibit 'genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex,'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Even if the court were to find that Defendants' behavior was "based on sex," Plaintiff has not alleged facts such that a reasonable jury could find that "a hostile or offensive work environment that was severe or pervasive" existed.  To determine whether "the alleged harassment [because of sex] is sufficiently severe or pervasive to constitute a hostile environment," the court engages in a "totality of the circumstances" inquiry because to "disaggregate" claims renders them more easily dismissible.  *Williams*, 187 F.3d at 562-63 ("This totality-of-the-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action.  Hence, courts must be mindful of the need to review the work environment as a whole, rather

11

than focusing single-mindedly on individual acts of alleged hostility."). To show a "severe or pervasive" hostile work environment, a plaintiff must "establish that her environment was objectively hostile, and also that she subjectively perceived the environment to be hostile." *Id.* at 564. "[T]he focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Id.* at 368.

"Title VII does not prohibit all verbal or physical harassment in the workplace." *Morris*, 201 F.3d at 790-91 (distinguishing between conduct based on dislike of plaintiff and conduct based on sex). "These standards for judging hostility are sufficiently demanding to ensure that [T]itle VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788. "We directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 787-88.

Plaintiff complains of Defendant Thompson's statements, Defendant Pearce's remarks regarding his discomfort speaking to women, Defendant Pearce's undermining and usurpation of Plaintiff's authority and duties, and the harsh statements and format of the October 2006 Board meeting. Most of these events took place within the last twelve months of Plaintiff's nearly five-year tenure as superintendent of MCSD. While Plaintiff has stated that *she* found the alleged harassment "pervasive" (Pl.'s Dep. at 64), Plaintiff has not shown facts upon which a reasonable person could determine that the

work environment had been rendered "objectively hostile" due to sexual harassment. *See Williams*, 187 F.3d at 368. Plaintiff recounts only a few stray comments from Defendants, and these are not enough to create the "pervasive" environment prohibited by Title VII. Nor were the comments severe; rather they constitute, at most, "mere offensive utterance[s]." *See Faragher*, 524 U.S. at 787-88. Plaintiff was a superintendent dealing with a school Board and members with whom she obviously – and admittedly – disagreed. Part of a superintendent's job is to discuss differences of opinion in school policy with the Board. Accepting Plaintiff's testimony, the Board, or at least a certain few members, treated her discourteously and less than professionally. The few occurrences of which Plaintiff complains, however, do not rise to the level of a "severe or pervasive" hostile environment.

To decide otherwise would allow plaintiffs to reach a jury on little more than evidence of occasional crude language or angry disagreement about business between contesting parties. That would dilute the "standards for judging hostility" and improperly bring about the "general civility code" against which the Supreme Court has warned. *Id.* at 788.

Once the court determines whether the conduct is actionable as discriminatory, the court must then determine whether "an employer will be liable for a discriminatory environment that is otherwise actionably abusive." *Id.* If the individual accused of discriminatory conduct serves in a position sufficiently high enough in the organization for one to consider him the organization's proxy, then the individual's actions may be automatically imputed to the employer. *Id.* at 789-90.

"[A]n individual employee/supervisor, who does not otherwise qualify as an

'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Even if the court were to find that Plaintiff had an actionable claim under Title VII, there is no individual liability for Defendant Pearce and Defendant Thompson under the statute. *See Wathen*, 115 F.3d at 405. As President and Trustee of the Board, however, Defendant Pearce's and Defendant's Thompson's actions could be imputed to the Board because of their positions. However, because the court has found no violation of Title VII, the court need not address the further issue of Board liability in this case.

Plaintiff also makes claims of sexual harassment under the Michigan statute analogous to Title VII, the Elliott-Larsen Civil Rights Act ("ELCRA"). Mich. Comp. L. §§ 37.2101 *et seq.* ELCRA states in relevant part:

> (i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions: (*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing. (*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing. (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, education, or housing environment."

Mich. Comp. L. § 37.2103(i).

To establish a prima facie hostile work environment claim under ELCRA, "an employee must establish the following five elements: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the

basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior." *Schemansky v. California Pizza Kitchen, Inc.*, 122 F. Supp. 2d 761, 771 (E.D. Mich. 2000); *see also Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 915 (Mich. 2000); *Quinto v. Cross and Peters Co.*,547 N.W.2d 316, 319-20 (Mich. 1996).

While "Michigan courts consider federal case law interpreting Title VII to be persuasive, albeit not binding, authority on issues brought under the Elliot Larsen Civil Rights Act when the language of the two civil rights acts is substantially similar, *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 488 (6th Cir. 2006) (citing *Pena v. Ingham County Road Comm'n*, 660 N.W.2d 351, 358 n.3 (Mich. App. 2003)), the Michigan Supreme Court has expressly determined that "only conduct or communication that is sexual in nature can constitute sexual harassment, and thus conduct or communication that is gender-based, but that is not sexual in nature, cannot constitute sexual harassment."  *Haynie v. Dep't of State Police*, 664 N.W.2d 129, 135 (Mich. 2003).  Unlike Title VII, ELCRA does not allow claims based on non-sexual conduct.  Given this standard, the only comments Plaintiff has alleged that one could consider sexual in nature are Defendant Thompson's taunt to Plaintiff to peek in my windows (Pl.'s Dep. at 45) and his boast that he had "the balls" to tell Plaintiff she was "doing a lousy job" (Pl.'s Dep. at 87).  While the court determined above that these comments failed to constitute "sexual harassment" under Title VII's broader standard, even if they were considered sexual comments, Plaintiff would still fail to state a claim

because Michigan courts would find them de minimis in nature.  See *Haynie*, 664

N.W.2d at 135-36 (finding no claim for sexual harassment under ELCRA when plaintiff

did not allege "unwelcome sexual advances, requests for sexual favors, [or] other verbal

or physical conduct or communication of a sexual nature").

Plaintiff has not shown that a material issue of fact exists regarding her claims

under Title VII and ELCRA because she has not met the threshold showing that the

alleged sexual harassment was "based on sex" or created a "severe or pervasive"

hostile work environment.  Therefore, the court will grant defendant's motion for

summary judgment with respect to the claims of sexual harassment under both Title VII

and ELCRA.

## B. Breach of Contract/Constructive Discharge

Plaintiff also argues that Defendant breached her contract when she resigned her

position because Plaintiff had been constructively discharged in light of the prevailing

circumstances.  "[C]onstructive discharge is not in itself a cause of action, although it is

routinely alleged as a separate count in complaints for wrongful discharge.  Rather

constructive discharge is a defense against the argument that no suit should lie in a

specific case because the plaintiff left the job voluntarily.  Thus, an underlying cause of

action is needed where it is asserted that a plaintiff did not voluntarily resign but was

instead constructively discharged."  *Vagts v. Perry Drug Stores, Inc.* 516 N.W.2d 102,

104 (Mich. Ct. App. 1994) (internal citations omitted). "It is well established that the law

does not differentiate between employees who are actually discharged and those who

are constructively discharged."  *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596,

600 (Mich. 1996).  Plaintiffs in sexual harassment suits often raise constructive

discharge arguments because it forms the basis both of a state law contract claim and also as an element of a retaliation claim under Title VII and ELCRA,[3] although the court only analyzes the former in this section and reserves analysis of the latter for the subsequent section. "[A] constructive discharge occurs only where an employer or its agent's conduct is so severe that a reasonable person in the employee's place would feel compelled to resign." *Champion*, 545 N.W.2d at 600 (citing *Vagts*, 516 N.W.2d at 104).

Here, Plaintiff argues that Defendants made her job impossibly difficult by undermining her authority and usurping her duties (Pl.'s Resp. at 14). A reasonable person, Plaintiff argues, would have felt "compelled to resign." *Id.* While constructive discharge examines the intent of the employer, and "[a]n employer will be held to intend the reasonably foreseeable consequences of his or her conduct," *Pitts v. Michael Miller Car Rental*, 942 F.2d 1067, 1072 (6th Cir. 1991), the court here cannot find that a triable issue of fact exists supporting the necessary conclusion that a reasonable person would have felt compelled to resign. Plaintiff has failed to show a genuine factual issue for several reasons.

First, the conditions under which Plaintiff described having to work are simply not of the extreme type typically present in successful constructive discharge cases reported in Michigan law, and thus not fairly contemplated by Michigan courts as

---

[3] To show constructive discharge premised on sexual harassment, a plaintiff must show more than a Title VII violation. *Moore v. KUKA Welding Systems N Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). While Plaintiff has failed to show a triable issue of fact regarding a Title VII violation, the court must still ascertain whether Plaintiff has presented a triable issue of fact with respect to her constructive discharge claim on the basis of Defendants' interference with her official duties.

sufficient under the doctrine.  An employee "may not be unreasonably sensitive to his working environment."  *Burt v. Bd. of Educ.*, No. 93-1507, 1994 WL 463976, at *3 (6th Cir. Aug. 26, 1994).[4]  Plaintiff's situation was, the court presumes, not comfortable for her and was made more difficult than anyone in Plaintiff's position would have preferred. The Board, however, did not subject Plaintiff to the types of severe conditions (e.g., inducing or requiring the commission of fraud or illegal activity) under which Michigan courts have found constructive discharge may apply.  *See Vagts*, 516 N.W.2d at 103 (finding material issue of fact when plaintiff claimed constructive discharge and was repeatedly asked to break the law and lie); *Champion*, 545 N.W.2d at 600 (finding that an alleged forcible rape of the plaintiff by a supervisor constitutes conduct severe enough to result in constructive discharge); *Manning v. City of Hazel Park*, 509 N.W.2d 874, 880 (Mich. Ct. App. 1994) (finding constructive discharge may be supported when an employee was presented only with the options of retiring, resigning, or arguing her case for continued employment publically before the city council).  Accepting that Defendant Pearce's actions occurred just as Plaintiff alleges, they still did not render Plaintiff's job "intolerable" so as to constitute constructive discharge.  *See Brelsford v. U.S. Foodservice, Inc.*, No. 06-13628, 2007 WL 2902873, at *3 (E.D. Mich. Oct. 2, 2007) (stating that Plaintiff must show that "the employer deliberately created intolerable working conditions") (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2000)).

---

[4] The court acknowledges that unpublished decisions in the Sixth Circuit are not binding precedent, *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996) (holding that unpublished opinions "carry no precedential weight [and] . . . have no binding effect on anyone other than the parties to the action"), but their reasoning may be "instructive" or helpful, *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 593 (6th Cir. 2004).

Plaintiff alleges chiefly that Defendant Pearce, while President of the Board that employed Plaintiff, interfered with or even assumed certain of her duties, communicated directly with some employees under her command, and neglected or refused to return telephone calls she placed to him. Yet Plaintiff continued in her position nearly two months beyond even the October 2006 Board meeting despite her allegation of "intolerable" working conditions, and she had earlier received sound formal job reviews and consistent contractual and discretionary increases in her compensation. *See id.*; *LaPointe v United Autoworkers Local 600,* 103 F.3d 485, 489 (6th Cir. 1996) ("[A]n employee who leaves his employment when he has been presented with legitimate options for continued employment with that employer . . . is precluded from claiming constructive discharge.").

Second, because the relevant standard is an objective one, the court must examine how a reasonable person in Plaintiff's position would have acted. *Burt*, 1994 WL 463976, at *3. Plaintiff rose to a high-level position in the administration of a Michigan school system by becoming Superintendent. The position is analogous to being Chief Executive Officer of the school system and is the highest appointive executive official of that level of government. *See Nalepa v. Plymouth-Canton Cmty. Sch. Dist.,* 525 N.W.2d 897, 902 (Mich. Ct. App. 1994), *result only aff'd* 548 N.W.2d 625 (Mich. 1995). A reasonable person in such a position must know, among other things, that the Board would have the right to review and "discuss" with the superintendent "areas of mutual concern," including "day-to-day operation[s]" and her performance as an employee. (Pl.'s Contr. § V.) This, a person in Plaintiff's position must know, would sometimes occur at a meeting of the Board which, by law, must be open, Mich. Comp.

L. §§ 15.263 *et. seq.,* unless the discussion is such as "to consider a periodic personnel evaluation of . . . [an] employee" <u>and</u> that "person requests a closed hearing." Mich. Comp. L. § 15.268. In other words, a reasonable person would know that tough and open – perhaps public – criticism of his or her job performance might be forthcoming. Hard-hitting job evaluations or criticisms undertaken pursuant to contract, even if at an open meeting convened consistent with Michigan law,[5] cannot form the basis for a claim of (constructive) discharge in breach of that contract. *See Wade v. Knoxville Utilities Bd.,* 259 F.3d 452 (6th Cir. 2001) (observing that "dealing with coworkers and accepting supervision and constructive criticism" were "essential functions" of even a rudimentary employment position).

Third, Plaintiff's claim is defective because it centers upon acts performed by Defendant Pearce, characterized by Plaintiff as her "boss," whose acts, Plaintiff says, interfered with and "usurped" her duties. Defendant Pearce, however, was not Plaintiff's employer. Plaintiff was the employee of the District as an entity, represented by the Board as a whole. *See Wayne County Sheriff v. Wayne County Bd. Of Comm'rs*, 385 N.W.2d 267, 269 (Mich. Ct. App. 1983) ("[I]ndividual board members' viewpoints are not relevant since the board exercises its power as a collective entity and not as individuals."). The individual, occasional acts of one member of that Board, if thought by Plaintiff to be inconsistent with or even to substantially interfere with her stated

---

[5] Even if Plaintiff argues that the October 2006 Board meeting was closed to the public and thus not in accord with Michigan law, Plaintiff herself attended and presumably acquiesced to the closed nature of the meeting to avoid having the Board's criticism of her broadcast publicly.

employment responsibilities, must naturally form the basis of one of many "areas of mutual concern" ripe for discussion with the Board "at least quarterly," consistent with the terms of her contract. (Pl. Contr. § V.) In short, mere disagreements with, or problems concerning, the way in which the school system was being managed – or mis-managed – all of which are designed to be taken into account in the execution and two-way review of Plaintiff's performance under an employment contract, should not be permitted to form the basis for a breach of that very contract. To say otherwise is to distort ordinary business-related employment disagreements beyond recognition into causes of action.

Finally, while Plaintiff claims repeatedly that Defendants undermined her authority, she points to no specific evidence of "conduct . . . so severe that a reasonable person in the employee's place would feel compelled to resign,"[6] *Champion*, 545 N.W.2d at 600, without which she cannot overcome a summary judgment motion on her constructive discharge/breach of contract claim. To further illustrate, the court observes that "constructive discharge" can also constitute an essential element – an "adverse employment action" – in claims other than breach of contract (such as Title VII

---

[6] The court acknowledges Defendant's oral argument point that Plaintiff in her dealings with the Board, her letter of resignation, and her contemporary public statements never included mention of any inappropriate conduct at all, to say nothing of conduct that was "so severe," etc. Indeed, the resignation letter speaks mainly of problematic "philosophical differences" and applauds the "great strides" made by the District in the recent few years. (Def.'s Mot. Ex. 1.) It remains true, however, that Plaintiff is entitled to rely upon her sworn testimony in the record at hand, simultaneously disavowing as false, or perhaps incomplete, her earlier statements to the contrary. If the case were to proceed to a jury, such matters would simply be reserved for credibility testing in cross examination.

retaliation claims[7]).  An "adverse employment action" must be more than "mere inconvenience or an alteration of job responsibilities."  *Wilcoxon v. Minnesota Min. & Mfg. Co.*, 597 N.W.2d 250, 258 (Mich. Ct. App. 1999) (citing *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993)).  Analogizing Plaintiff's breach of contract claim to a typical Title VII retaliation claim, and noting that an "adverse employment action" encompasses behavior less severe than either actual or constructive discharge,[8] there would be insufficient facts present in this record for Plaintiff to pass even that lower evidentiary barrier.  Defendant Pearce inconvenienced Plaintiff or, at most, reduced a few of her job responsibilities – in fact, but not officially – by taking them upon himself.  *See Wilcoxon*, 597 N.W.2d at 258.  There must be some objective basis for demonstrating that the change is adverse because "a plaintiff's 'subjective impressions . . . [are] not controlling."  *Id. (*citing *Kocsis v. Multi-Care Mgt., Inc.,* 97 F.3d 876, 886 (6th Cir. 1996)).  Plaintiff cannot prove that she was constructively discharged, and in turn is unable to show that Defendants breached her contract of employment.  The court will grant Defendants' motion for summary judgment with respect to Plaintiff's breach of contract claim.

### C. Title VII and Elliott-Larsen Retaliation Claims

Under Title VII an employer may not discriminate:

against any of his employees . . . because [the employee] has opposed

---

[7] *See infra* Section III.C.

[8] Examples of "adverse employment actions" less severe than constructive discharge include demotion, decrease in pay, and being given a less distinguished title. *See Wilcoxon*, 597 N.W.2d at 258.  Plaintiff has not even alleged any of these "adverse employment actions" to support her constructive discharge/breach of contract claim.

any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "To establish a *prima facie* case of retaliation, Plaintiff must establish that: '(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.'" *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Similarly, ELCRA prohibits retaliation against a person "because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding or hearing under this act." Mich. Comp. L. § 37.2701(a). "A prima facie case of retaliation can be established if a plaintiff proves: (1) that he was engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Pena v. Ingham County Road Comm'n*, 660 N.W.2d 351, 358 (Mich. Ct. App. 2003). Because "[i]t is well-settled that when the language of the CRA and Title VII are substantially similar, our courts consider federal case law interpreting Title VII to be persuasive, albeit not binding, authority on issues brought under [ELCRA]," *Pena*, 660 N.W.2d at 358 n. 3, and no Michigan state law deviates from this equation, the court analyzes Plaintiff's retaliation claims together.

23

Plaintiff has not alleged that she engaged in any "protected activity" under Title

VII. Other than requesting that Defendant Pearce restrain Defendant Thompson's

language (Pl.'s Dep. at 46), and to act more diligently in communicating with her (Pl.'s

Dep. at 67-68), Plaintiff filed no formal complaint nor participated in any of the

proceedings contemplated by the statute.

"Although there is no exhaustive list of adverse employment actions, typically it

takes the form of an ultimate employment decision, such as 'a termination in

employment, a demotion evidence by a decrease in wage or salary, a less distinguished

title, a material loss of benefits, significantly diminished material responsibilities, or other

indices that might be unique to a particular situation.'" *Pena*, 660 N.W.2d at 358

(quoting White v. Burlington N & SF R Co., 310 F.3d 443, 450 (6th Cir. 2003)). "In

determining the existence of an adverse employment action, courts must keep in mind

the fact that '[w]ork places are rarely idyllic retreats, and the mere fact that an employee

is displeased by an employer's act or omission does not elevate that act or omission to

the level of a materially adverse employment action.'" *Id.* at 358-59 (quoting *Blackie v.*

*Maine*, 75 F.3d 716, 725 (1st Cir. 1996)). Plaintiff claims that her constructive discharge

constitutes an "adverse employment action," giving her a claim of retaliation under

federal and state law. The court, however, determined above that no constructive

discharge occurred based on Plaintiff's presentation of the facts. Consequently, Plaintiff

has suffered no "adverse employment action" that would entitle her to relief under a

retaliation claim. *See Wilcoxon*, 597 N.W.2d at 258.

Even if the Plaintiff had demonstrated constructive discharge, she has not

alleged any causal connection between a "protected activity" under Title VII and an "adverse employment action."  While in her response Plaintiff did allege a connection between alleged sexual harassment and an "adverse employment action" (Pl.'s Resp. at 7-8), such a nexus does not meet the requirements for bringing a retaliation claim. Because Plaintiff did not engage in a protected activity under Title VII, she can show no causal connection to an "adverse employment action.  *See Pena*, 660 N.W.2d at 358. The court will grant Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims under Title VII and ELCRA.

### D. Equal Pay Act

The Equal Pay Act precludes employers from paying employees at a lower rate than employees of the opposite sex for equal work.  29 U.S.C. § 206(d).  To establish a prima facie case of wage discrimination under the Act, "plaintiffs must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)).  To rebut a plaintiff's case, a defendant must then demonstrate that one of four possible affirmative defenses justifies the wage differential under the Act: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Beck-Wilson*, 441 F.3d at 360 (quoting *Buntin v. Breathitt County Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998)).  If a plaintiff proves a prima facie case under the Act, a court can grant summary judgment to a defendant only if he establishes one of the affirmative defenses so clearly that "no

rational jury could have found otherwise." *Beck-Wilson*, 441 F.3d at 365. "[T]o be entitled to summary judgment, the defendant must prove that there is no genuine issue as to where the difference in pay is due to a factor other than sex." *Balmer v. HCA, Inc.*, 423 F.3d 606, 612 (6th Cir. 2005) (citing *EEOC v. Romeo Cmty. Sch.*, 976 F.2d 985, 989 (6th Cir. 1992)). "The Equal Pay Act's catch-all provision 'does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason.'" *Balmer*, 423 F.3d at 612 (*EEOC v. J.C. Penney Co., Inc.*, 843 F.2d 249, 253 (6th Cir. 1988)). After defendant proves an affirmative defense, the plaintiff "bears the burden of producing evidence creating a triable issue of fact that the reasons offered by [d]efendant are pretextual." *Balmer*, 423 F.3d at 613 (citing *Buntin*, 134 F.3d at 800 n. 7).

Plaintiff argues that the Board paid both her predecessor and successor higher salaries than they paid Plaintiff. Plaintiff's starting salary was $91,000.00, in addition to which she received benefits and monetary bonuses. She also received increases in salary such that the Board paid her $121,270.09 during her final year at MCSD. When the Board hired Plaintiff's predecessor, Dr. Luis Gonzalez, they paid him $85,413.00 per year for his first year of employment. When he left his position as superintendent four years later, Dr. Gonzalez did receive a higher salary than the Board paid Plaintiff during her first year in the position. The Board paid Plaintiff's male successor, Interim Superintendent Dennis Rottenbucher, the same amount per day as the Board paid Plaintiff despite Plaintiff's greater experience in education and administration.[9]

---

[9] Plaintiff also alleges that Defendants violated the Equal Pay Act when they reduced Interim Superintendent Rottenbucher's pay in an attempt to comply with the

At most Plaintiff has shown that in the year immediately preceding her first year as superintendent, the Board paid Dr. Gonzalez a higher salary, and that her immediate successor, Interim Superintendent Rottenbucher, was paid a very nearly equivalent amount. To rebut Plaintiff's EPA claims, Defendant has shown that predecessor had more experience and a higher level of education when hired than did Plaintiff such that even if a wage differential existed, Defendants have shown that any such wage differential was based on a "factor other than sex." *Beck-Wilson*, 441 F.3d at 360. Plaintiff offers no pretextual reason to counter Defendants' reason for any wage differential. *See Balmer*, 423 F.3d at 613.

Plaintiff has shown no wage differential between herself and her immediate successor other than to not he was paid the same per diem amount. Plaintiff does not allege the elements of a claim under the EPA. See *Beck-Wilson*, 441 F.3d at 359. Plaintiff's seems to claim that it was unfair of the Board to pay the same amount to her immediate successor because he had much less experience than she had. However, this does not state a claim under the EPA. *See* 29 U.S.C. § 206(d).

### E. Equal Protection

To make a claim under § 1983, a plaintiff must show: (1) conduct by a person, (2) acting under color of state law, (3) proximately causing, (4) a deprivation of a federally protected right. *Monnell v. Dep't of Social Serv.*, 436 U.S. 658, 692 (1978).

"A governmental entity, such as the Board in this case, can be held liable under § 1983 only if a plaintiff establishes 'an unconstitutional action that implements or

---

Act. Because the court finds no violation by Defendants of the Act, neither do Defendants violate the act if they reduced Interim Superintendent Rottenbucher's pay.

executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) (quoting *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir. 2003)).

Plaintiff argues that the sexual discrimination she alleges she sustained from Defendants entitles her to a § 1983 claim for equal protection of the laws under the Fourteenth Amendment. "The showing a plaintiff must make to recover on an employment discrimination claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 794 (6th Cir. 2000) (citing *Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475, 483-84 (6th Cir. 1989)).

Because the court has already found that Plaintiff has not alleged facts of a sexual harassment claim under Title VII sufficiently to overcome summary judgment, neither has the Plaintiff therefore alleged facts sufficient under § 1983 to overcome summary judgment regarding Plaintiff's equal protection claim.

## IV.  CONCLUSION

For the reasons stated above, IT IS ORDERED that Defendants' motion for summary judgment [Dkt. # 23] is GRANTED and Plaintiff's motion to strike [Dkt. # 27] is DENIED.  A separate judgment will issue.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 30, 2008


       I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 30, 2008, by electronic and/or ordinary mail.

s/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C2 ORDERS\07-14648.MILLS.HostileEnvironment.SexualHarassment.Elliott-Larsen.ContractBreach.EqualProtection.10.wpd

29